UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| REBECCA JORDAN-SWEENEY,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF MICHIGAN, MICHIGAN DEPARTMENT OF TECHNOLOGY, MANAGEMENT & BUDGET (DTMB),<br><br>Defendant. | Case No.<br><br>Hon.<br>United States District Judge |

**COMPLAINT AND JURY DEMAND**

Rebecca Jordan-Sweeney, by and through her attorneys, Pitt McGehee Palmer Bonanni & Rivers PC, brings this action against Defendant State of Michigan, Michigan Department of Technology Management and Budget for wrongful discharge and civil rights violations under the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §§ 701 et seq., Michigan's Persons with Disabilities Civil Rights Act ("PDCRA"), MCL 37.1201 et seq., and the Family and Medical Leave Act ("FMLA"), 42 U.S.C. §§ 12101 et seq. In support of her claims, Plaintiff states as follows:

**Parties, Jurisdiction, and Venue**

1. Defendant State of Michigan, Michigan Department of Technology

Management and Budget ("DTMB" or "Defendant") is an administrative department headed by a Director who reports to the Governor.

2. The State of Michigan and DTMB receive federal funding every year through direct federal revenue appropriated through the Michigan Legislature.

3. Plaintiff Rebecca Jordan-Sweeney ("Ms. Jordan-Sweeney" or "Plaintiff") is a former employee of Defendant and current resident of Calhoun County, Michigan.

4. This Court has jurisdiction over this controversy pursuant to 28 U.S.C. §1331 to enforce the provisions of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq., and the Family and Medical Leave Act, 42 U.S.C. §§ 12101 et seq.

5. This Court also has supplemental jurisdiction pursuant to 28 USC § 1367 to address claims brought under Michigan's Persons with Disabilities Civil Rights Act ("PDCRA") MCL 37.1201 *et seq.*, because the state law claims are so related to the federal claims that they form part of the same case or controversy.

6. Venue is proper in the Western District of Michigan because the events giving rise to this cause of action occurred in this district and all parties reside in or operate within this judicial district.

7. On May 5, 2026, Plaintiff filed a timely Notice of Intent with the Michigan Court of Claims pursuant to MCL 600.6431.

8. On July 15, 2026, Plaintiff filed a timely Amended Notice of Intent with

the Michigan Court of Claims pursuant to MCL 600.6431.

## FACTUAL ALLEGATIONS

9. Plaintiff Rebecca Jordan-Sweeney is an IT professional with nearly thirty years of experience.

10. In the course of her career, Jordan-Sweeney has worked in the IT field as a project manager, senior developer, and a business analyst.

### July of 2015: Ms. Jordan-Sweeney Begins Working for the State of Michigan

11. In January of 2015, Ms. Jordan-Sweeney was hired as a contractor for the State of Michigan Department of Technology, Management, and Budget (DTMB), working as a Business Analyst.

12. In July of 2015, Ms. Jordan-Sweeney was hired by the DTMB as a full-time employee, as Business Analyst (ITPA 12).

13. On March 13, 2016, Ms. Jordan-Sweeney was promoted to IT Manager (ITM 14), specifically, Eligibility Development Manager in the Systems Development Division.

14. "The Department of Technology, Management and Budget supports the business operations of state agencies through a variety of services, including building management and maintenance, information technology, centralized contracting and procurement, budget and financial management, space planning and

leasing, construction management, motor vehicle fleet operations, and oversight of the state retirement systems."[1]

15. The State of Michigan and DTMB receive federal funding every year through direct federal revenue appropriated by the Michigan Legislature.

16. As an Eligibility Development Manager, Ms. Jordan-Sweeney "function[ed] as a first-line manager in a complex work area for Agency Services supporting MDHHS." Ms. Jordan-Sweeney supervised "the activities of a technical staff of Information Technology Programmer/Analysts and oversees contractors that are involved in the development of highly complex and sensitive computer applications in a volatile environment. The Development Team is responsible for Eligibility Division systems and assigned development. It is also the responsibility of this position to ensure projects are clearly defined for the development team, develop the structural framework in which staff design and implement systems, and select and train employees."

17. As an Eligibility Development Manager, Ms. Jordan-Sweeney initially reported to State Administrative Manager Christopher Rose ("Rose") (State Administrative Manager), who, in turn, reported to Sanjay Srivastava ("Srivastava"), Division Director, Eligibility Area.

---

[1] https://www.michigan.gov/dtmb

18. Jeff Haskell ("Haskell") began supervising Ms. Jordan-Sweeney, and approximately seven or eight other Eligibility Development Managers, when she was assigned to lead a software testing team.

19. In 2021, when Haskell retired, John Hart ("Hart") became the new State Administrative Manager and began supervising Ms. Jordan-Sweeney and the other Eligibility Development Managers.

**2015 – 2023: Ms. Jordan-Sweeney Worked Remotely on a Hybrid or Full-Time Basis**

20. When Ms. Jordan-Sweeney assumed her position in 2015, DTMB policy permitted all employees to work remotely two days per week.

21. Then, throughout the COVID-19 pandemic, DTMB employees, including Ms. Jordan-Sweeney, began working on a fully remote basis beginning in March of 2020.

22. Ms. Jordan-Sweeney excelled in her role throughout 2020 and 2021 while she was working remotely five days a week.

23. In 2020, State Administrative Manager Jeffrey Haskell rated Ms. Jordan-Sweeney "Meets Expectations" overall and "High Performing" in several metrics and opined:

> "Rebecca sets high performance expectations not only for herself but of team members. Meets with the team build a strong work ethic as well buy-in and commitment from the team to perform and achieve results. Always looking for improvements [sic] and being accountable to

increase efficiencies within the organization."

"Consistently demonstrates solid communication skills, both verbal and written, presents complex ideas and topics in a concise understandable manner. Puts a lot [of] thought into her communications to that others understand what is being communicated and it['s] intent / message.

Makes every effort to actively engage her team and others to ensure they understand the directions and goals of the team / division / department / organization."

"Gathers information and formulates well thought out decisions based on research and data gathered, and actively involves others in the process. She collaborates with customer and vendor and makes successful decision in the testing processes. Applies rationale and sound judgment to the process and will support the unpopular decision when needed."

"Met with Rebecca on 11/5/20 discussed the team and how they are doing working from home, she and her team are doing well meeting all requirements and dates."

"Rebecca continues to grow as a leader working with her team to meet the organization[al] goal and objects, her leadership style is straight forward and takes pride in her performance. Takes a proactive approach to identify and schedule her task as well as those of her team. . ."

"Rebecca demonstrates many outstanding leadership traits and capabilities; she has a strong desire to excel and continues to improve in all aspects of her leadership position utilizing a strong desire to success. She is very focused on the departments / eligibilities area's processes, procedures, and best practices ensuring that all criteria as well as requirements are met."

24. In 2021, State Administrative Manager Jeffrey Haskell rated Ms. Jordan-Sweeney "High Performing" overall and "High Performing" in several metrics and opined:

> "Rebecca has been in the past year presented [with] many challenges and direction changes by DTMB leadership both with working remote as well as the returning to work decisions that have been made or are still being determined. She has remained open to changes and flexible as she has been able to redirect activities to align with new guidelines to follow. [A]lso[,] there wer many changes in the direction migrate to a new testing tool. The direction changes were predicated on DTMB's leadership direction to decide on a new testing tool which would meet both the security and budget issue constraints that had to be taken into account. Rebecca did several proposals of possible tools that could improve the overall quality of the product being delivered and productivity of the testing teams to be able to find and resolve defects prior to delivery to DHHS.
>
> Thank you to Rebecca and her team as COVID has brought many challenges to the management staff this past year, shifting our processes and procedure to take into account to manage staff and projects remote on a full time basis. Working with Rebecca and team provided to be effective because of the extra effort and straight for forward communication within teams to make sure everyone understood what the expectations were."

25. Upon the conclusion of COVID-19 policies, all DTMB employees were permitted to work remotely four days per week, beginning in approximately June 2022.

**2023: DTMB Approved Ms. Jordan-Sweeney's Request for Accommodation to Continue Working Remotely Full-Time**

26. Ms. Jordan-Sweeney has suffered from Heart Failure with Preserved Ejection Fraction since approximately 2017.[2]

---

[2] Ms. Jordan-Sweeney has also been diagnosed pulmonary arterial hypertension since December 5, 2025. The stress of the incidents detailed herein contributed to this diagnosis.

27. “Heart failure occurs when the heart muscle doesn’t pump blood as well as it should. When this happens, blood often backs up and fluid can build up in the lungs, causing shortness of breath.”[3]

28. As a consequence of Ms. Jordan-Sweeney’s diagnosed heart failure, Ms. Jordan-Sweeney regularly struggles with shortness of breath, which is exacerbated by physical activity, including walking.

29. Accordingly, when employees began returning to work in person at the DTMB offices, Ms. Jordan-Sweeney submitted a request in January 2023 to accommodate her disability, i.e., heart failure, to continue work remotely on a full-time basis.

30. Ms. Jordan-Sweeney confirmed approval of the requested accommodation through her chain of command, receiving approval from her direct supervisor John Hart, followed by his supervisor Sanjay Srivastava, Division Director, Eligibility Area, then IT General Manager Nathan Buckwalter, up to Cindy Peruchietti (“Peruchietti”), DTMB Agency Services Director.

31. Each person in the chain of command gave their assent to the accommodation.

32. Following the chain of command approval, on March 21, 2023,

[3] https://www.mayoclinic.org/diseases-conditions/heart-failure/symptoms-causes/syc-20373142

Peruchietti, DTMB Agency Services Director, called Ms. Jordan-Sweeney to request the necessary paperwork and directed Ms. Jordan Sweeney to continue working remotely full time while she processed the request.

33. Peruchietti then provided Ms. Jordan-Sweeney's request to both DTMB Director Michelle Lange and DTMB CIO Laura Clark to finalize the accommodation.

34. Ms. Jordan-Sweeney's supervisor, John Hart, communicated to her on multiple occasions that he considered Peruchietti's response to constitute an approval for the accommodation.

35. DTMB never provided a formal written approval to Ms. Jordan-Sweeney.

36. DTMB HR referred to the approval as a "chain of command approval."

37. This was an approved method for submitting requests for accommodation in the DTMB Agency Services Policies & Procedures as of 2023.[4]

**2022 – 2025: Ms. Jordan-Sweeney Worked Remotely on a Full-Time Basis to Accommodate Her Disability and Received Outstanding Performance Reviews**

38. DTMB management and supervisors accepted Ms. Jordan-Sweeney's remote work accommodation for over two years.

[4] Chain of command approval remained as an approved method for accommodations in the revised Policies & Procedures released in 2025. This is detailed further below.

39. Ms. Jordan-Sweeney worked fully remotely throughout 2023, 2024, and the first half of 2025, successfully performing all of her job responsibilities without incident.

40. Throughout her employment, Ms. Jordan-Sweeney excelled in her role, receiving positive performance evaluations and praise from her supervisors regarding her communication, collaboration, problem-solving skills, adaptability and more.

41. In 2023, while she was working remotely five days a week, supervisor John Hart rated Ms. Jordan-Sweeney either "High Performing" or "Meets Expectations" in every area of her performance review.

42. Hart stated in the 2023 performance review:

> "Rebecca has demonstrated exceptional skills in building and maintaining relationships with MDHHS customers at various levels. Her ability to establish rapport and trust with customers reflects positively on the department."
>
> "Customers appreciate Rebecca for her deep technical knowledge and skills. Her proficiency allows her to effectively address and assist with technical issues or changes. This contributes to the smooth operation of technical processes and enhance customer satisfaction."
>
> "Rebecca's ability to communicate effectively is noteworthy. Her communication skills bridge the gap between technical complexities and the understanding of customers, fostering a positive and collaborative working relationship."
>
> "Rebecca is recognized for her integrity, attention to detail, and consistent follow-through. These qualities instill confidence in her customers, and they often seek her out for assistance, knowing they can

rely on her reliability and commitment."

"Rebecca is highly involved in the daily support of systems and projects under her responsibility. Her active participation in meetings showcases her commitment to staying informed and contributing effectively to discussions."

"Rebecca actively participates in meetings related to her roles as Technical Owner for Testing, MAGI, and OWDT. Her involvement extends beyond resource management, and she demonstrates valuable skills in decision-making, communication, and relationship management."

"Rebecca's performance in assuming new work responsibilities, particularly in the migration of testing machines, is commendable. Her proactive and effective approach to managing technical tasks reflects a strong willingness to take on challenges."

"Rebecca's positive relationships extend beyond her immediate team, encompassing contractors on other teams. Her collaborative approach fosters a sense of unity and shared goals across different project areas."

"Rebecca works closely with the technical resources she supervises, empowering them to work together as a team. She encourages innovation and forward thinking, fostering a collaborative and innovative work environment."

"Rebecca exhibits strong good decision-making abilities in various contexts, showcasing her analytical skills, technical knowledge, and strategic thinking."

"Recognized as an empathetic listener with a positive outlook, Rebecca plays a key role in supporting frustrated team members. She helps individuals see things from diverse perspectives, promoting understanding and contributing to the ongoing strength of the Eligibility team."

43. Likewise, in 2024, while Ms. Jordan-Sweeney was working remotely

five days a week, supervisor John Hart rated her either "High Performing" or "Meets Expectations" in every area of her performance review.

44. Hart stated in the 2024 performance review:

> "Rebecca has consistently demonstrated adherence to company policies, procedures, and standards while delivering timely customer service."
>
> "Rebecca's involvement in the CGI contract renewal resulted in a new contract which saves DHHS an estimated $500,000 annually. While this is [sic] represents a very small portion of DHHS' yearly technology spend, her contributions were beneficial and made a positive impact on the contract writing, and negotiating[] process."
>
> "In addition to the suggested examples which have been accomplished, Rebecca developed a spreadsheet that automatically calculates dates necessary for annual OWDT updates. This spreadsheet saves at least 3 days of work each time the updates are needed and ensure the OWDT team has accurate data with which to do their training.
>
> "MAGI's Federal Tax Information (FTI) findings were closed by the introduction of controls. Rebecca's participation in the discovery, documentation, implementation, and validation of said controls greatly assisted the team in resolving the findings. This finding closure had great impact on the entire Eligibility Team and was a great accomplishment, for this reason. High Performing has been awarded to Rebecca for this accomplishment."
>
> "Rebecca has partnered closely with her business, and technology[] peers throughout the year to improve collaboration and communication. This can be seen in her close collaboration with the CGI partner, the OWDT (DHHS Training Team), and the Bridges Release Train Engineer."
>
> "When tasked with writing the stories for the MAGI Objectives during the EL-382676 requirements and design phase, Rebecca completed the objectives the same day, ensuring timely delivery. **Her work received**

**praise from the BA, who described it as 'perfect' and 'gold star' worthy**. The fact that only minor adjustments were required, during subsequent reviews, **highlights Rebecca's ability to quickly adapt to new requests while maintaining a high standard of accuracy and professionalism**." (Emphasis added).

"In analyzing a test-finding related to AT packet construction, Rebecca worked closely with the technical team to implement a triage feature. Despite challenges, such as issues in recreating the behaviors during retesting and incomplete queries, provided by the technical team, Rebecca, and team, **demonstrated exceptional problem-solving** by clarifying the requirements. This ensured the correct execution of nested queries, and provided additional data, for technical resolution. Her persistence, and ability to adapt to changing circumstances, directly contributed to resolving the issue efficiently." (Emphasis added).

"Faced with increased scope from OWDT, Rebecca worked to determine and propose risk mitigation strategies that were ultimately approved by the customer, technical, and project teams. **Your ability to assess risks, align stakeholders, and develop practical solutions reflects your proactive and adaptive approach to managing unexpected challenges**." (Emphasis added).

Rebecca's ability to adapt swiftly to new tasks, overcome obstacles, and deliver impactful results consistently exceeds expectations. Her exceptional performance in adaptability serves as a model for others and significantly contributes to team and project success. Keep up the outstanding work!"

"Rebecca consistently demonstrates effective communication in addressing project needs and ensuring critical details are not overlooked. Her ability to identify potential gaps and escalate them appropriately has had a positive impact on project progress and outcomes."

"Rebecca's decision-making skills consistently exceed expectations, enabling you to deliver timely, effective, and impactful results. <u>Your performance sets a high standard for decision-making excellence and significantly contributes to the organization's objectives.</u> Great job!"

(Emphasis in original.)

"A colleague outside of Rebecca's team approached her with concerns about how issues were being handled by an external resource and the perceived conflict with internal processes. Rebecca took the following steps: 1) actively listened to the concerns and 2) offered a logical and clear explanation of how the process aligned with internal objectives, effectively resolving the individual's doubts. As a result, the colleague expressed appreciation, noting that Rebecca is consistently someone they can rely on to feel heard, respected, and guided with straightforward and logical explanations. This acknowledgement highlights their ability to build and maintain interpersonal trust across team boundaries." (Emphasis in original.)

45. As detailed in her performance reviews for 2023 and 2024, Ms. Jordan-Sweeney was able to perform all of her job duties while working remotely full-time.

46. From 2023 until 2025, DTMB did not request that Ms. Jordan-Sweeney reapply in order to continue the accommodation.

**June 2025: New Director Changes DTMB Accommodations Policy for Remote Work**

47. In early 2025, Ms. Jordan continued to work remotely, pursuant to her prior accommodations approval.

48. During this same time, Heather Frick ("Frick") became DTMB's new Agency Services Director.

49. In June of 2025, DTMB altered its policy to permit employees to work remotely three days per week.

50. In June of 2025, Frick updated DTMB's policy to require employees

with Remote Work Agreements to seek annual renewal.

51. By email on June 26, 2025, DTMB leadership notified employees of the new policy provided that reasonable accommodations for remote work would be "limited in duration." It further stated that if an employee requested remote work as a reasonable accommodation, the employee must "remain at work (no full remote work) until a determination is made."

**August – October 2025: DTMB Repeatedly Denies Ms. Jordan-Sweeney's Requests to Continue her Accommodation, Leading Her to Complain of Disability Discrimination**

52. Because Ms. Jordan-Sweeney's request to work remotely had previously been approved, on July 2, 2025, Human Resources Officer Katelyn Chapko ("Chapko") advised Ms. Jordan-Sweeney to send her "previous approval to Heather [Frick] to review to confirm that Heather has no concerns," in light of the new policy.

53. Chapko noted in her email to Jordan-Sweeney: "Chain of Command approvals can change anytime there is a change in Administration. . . . your direct supervisor has discretion to approve continued reasonable accommodation while you are awaiting a reply from Heather [Frick]."

54. The next day, July 3, 2025, Ms. Jordan-Sweeney's supervisor, John Hart, approved the continued reasonable accommodation by Teams message.

55. Hart stated: "you've been able to function[,] from my perspective, fully

remote with no issues."

56. There was no change in Ms. Jordan-Sweeney's job responsibilities in 2025 that required her to be in-office to successfully perform.

**July 7, 2025: Ms. Jordan-Sweeney Seeks to Confirm Continued Approval of Her Reasonable Accommodation**

57. Following Chapko's July 2nd instruction, Ms. Jordan-Sweeney emailed Frick on July 7, 2025, to notify her of the prior chain of command approval via Cindy Peruchietti. She sought confirmation from Frick that her request was granted.

58. On July 8, 2025, Frick responded to Ms. Jordan-Sweeney directing her to submit a new request for accommodation.

59. Confused, on July 21, 2025, Ms. Jordan-Sweeney reiterated that she had previously obtained approval for the accommodation request, after submitting supporting medical documentation of her need for accommodation and asked Frick to confirm she had no concerns.

60. Frick, again, insisted that Ms. Jordan-Sweeney submit a new request for accommodation.

61. On July 25, 2025, HR Director Catherine Lane emailed Ms. Jordan-Sweeney regarding the new policies. Lane advised:

a) "If a reasonable accommodation is denied or cannot be approved by HR or does not qualify under RA, an employee may request an

accommodation through the internal chain of command up through the DTMB Director."

b) That HR did not have a copy of a "final approval" for the reasonable accommodation in 2023.

c) "As this is over 2 years ago, and management has changed, a new request for approval would need to be completed."

62. On August 21, 2025, Lane emailed Ms. Jordan-Sweeney that she had not seen a new application for a reasonable accommodation, and therefore Ms. Jordan-Sweeney should return to the office in-person for work beginning August 25, 2025.

63. Jordan-Sweeney contacted her supervisor, Hart, who responded, "I am not certain what is going on with HR, but at this point (based on this email), you should prioritize getting your RA request sent to HR."

64. Ms. Jordan-Sweeney and Hart then spoke by phone that day. Hart was just as surprised as Ms. Jordan-Sweeney that the accommodation was still an issue.

**August 21, 2025: Leadership Directs Ms. Jordan-Sweeney to Report to Work in Person, Despite Her Repeated Requests for a Reasonable Accommodation and No Prior Issues with Remote Work**

65. Hart spoke with IT General Manager Nathan Buckwalter the same day and updated Ms. Jordan-Sweeney by email. He informed her: "Based on my conversation with Nathan, DTMB Leadership and HR, determined that neither have

an active RA request for you. Because of this, you are directed to work your in-office day(s)."

66. In the same email, Hart warned Ms. Jordan-Sweeney that HR would likely be watching to observe her compliance: "HR will likely identified [sic] use of leave on in-office days as a pattern, which is against DTMB policy."

67. Hart suggested that she could continue to use vacation days or sick leave for in-office days while she determined how she wanted to proceed.

68. In the same email, Hart directed Ms. Jordan-Sweeney that per his discussion with Buckwalter, "It was determined that your next working day would be the Tuesday following the Labor Day holiday," which would be September 2, 2025.

69. Ms. Jordan-Sweeney responded by email to ask if he could approve remote work by chain of command while she attempted to resolve the issue with HR.

70. Hart declined, stating, "I know we have already discussed this multiple times, but I want to just state again that this is the policy of the DTMB HR Department and it has been confirmed by the DTMB HR Director. Please make plans to report to Grand Tower for your in-office days or connect with DMO to discuss your FMLA options."

## September 2025: Ms. Jordan-Sweeney Repeatedly Applies for Accommodations and Attempts to Take FMLA Leave While She Waits for Approval

### A. September 8, 2025: Ms. Jordan-Sweeney Seeks Chain-of-Command Approval for the Accommodation

71. On September 8, 2025, Ms. Jordan-Sweeney emailed a request for accommodation to Frick, effectively seeking to renew her previous request for accommodation to work remotely on a full-time basis.

72. In the request, Ms. Jordan-Sweeney specifically informed Frick of the following:

a. That she suffered from Heart Failure with Preserved Ejection Fraction, which causes "shortness of breath, fatigue, and swelling in the legs,"

b. That her condition was exacerbated by traveling and walking,

c. That she was "requesting approval to continue working with this accommodation [to work remotely] which has been shown to be reasonable, effective, and without undue hardship" to the Department,

d. That multiple supervisors, including her present supervisor, had previously approved her request to work remotely,

e. That "[w]ith the accommodation under which I have been working for nearly three years, I have been able to perform to a level above and beyond satisfaction, the remaining requirements and duties of my position."

73. Frick responded the next day, on September 9, 2025: "At this time, your request is not approved." Frick directed Ms. Jordan-Sweeney to submit the request

through HR.

### B. September 8, 2025: Ms. Jordan-Sweeney Formally Requests FMLA Leave

74. Following John Hart's instruction in his August 21st email to report to work in person or "connect with DMO to discuss your FMLA options," Ms. Jordan-Sweeney emailed an Application for Leave of Absence to the Disability Management Office (DMO) on September 8, 2025.

75. Ms. Jordan-Sweeney checked "intermittent leave or reduced work schedule" on her application.

### C. September 12, 2025: Ms. Jordan-Sweeney Submits Second Renewed Accommodation Request to Work Remotely.

76. On September 12, 2025, Ms. Jordan-Sweeney submitted a second renewed request for accommodation, this time through the DTMB Office of Human Resources, on a Disability Accommodation Request and Medical Statement.

77. Ms. Jordan-Sweeney wrote in her email: "I am requesting to continue full time remote work … My disabilities cause me to experience difficulty in breathing, [and] walking…"

78. Ms. Jordan-Sweeney's request for accommodation was supported by medical attestations forms from three providers, including: (1) a statement from her cardiologist, Dr. Pranav Pandrangi, identifying that Ms. Jordan-Sweeney suffers from heart failure with preserved ejection fraction, which required her to stay seated

and work remotely; (2) a statement from her general practitioner, Judith Cronin NP, who noted “travel and office environment limits ability to comply with medications needed to prevent serious life threatening exacerbations of heart failure”; “potential infection and difficulty with medical treatments in the office setting will worsen cardiac heath [sic[ resulting in potential hospitalization/death”; and (3) a statement from her licensed professional counselor, Stanley W. Russell MAC, LPC, attesting to chronic PTSD and generalized social phobia, describing her “significant stress and anxiety response” in public spaces, which have arisen from the vulnerabilities of her heart condition.

### D. September 16, 2025: Ms. Jordan-Sweeney Submits Completed FMLA Paperwork

79. At this point, Ms. Jordan-Sweeney had a pending request for intermittent FMLA leave, which she had submitted to the DMO on September 8, 2025.

80. On September 16, 2025, Ms. Jordan-Sweeney submitted completed FMLA forms with supporting attestations from her providers, Dr. Pandrini, Cronin NP, and Russell LPC. She noted in her submission email: “I was advised to file an FMLA request to cover the period of review of the reasonable accommodation.”

81. On or about September 16, 2025, Labor Relations Specialist Dashonna Abdullah (“Abdullah”) contacted Ms. Jordan-Sweeney.

82. Abdullah told Ms. Jordan-Sweeney that she should be on disability leave while her reasonable accommodation request was pending.

83. Abdullah scheduled a virtual meeting with Ms. Jordan-Sweeney for September 18, 2025 to discuss her accommodations request.

84. Abdullah then proceeded to delay consideration of Ms. Jordan-Sweeney's accommodation request.

### E. September 18, 2025: HR Fails to Attend Scheduled Meeting Regarding the Accommodation Request.

85. Abdullah failed to attend the scheduled meeting on September 18, 2025 and re-scheduled the virtual meeting for the following day, September 19, 2025.

### F. September 19, 2025: HR Prematurely Ends Meeting Based on Purported Unwritten Policy Requiring Ms. Jordan-Sweeney to Appear on Camera.

86. On September 19, 2025, Abdullah attended the scheduled virtual meeting but declined to proceed because Ms. Jordan-Sweeney chose not to appear on camera, which Abdullah insisted violated an unwritten policy. Abdullah prematurely concluded the meeting stating, "Well, you refused to be on camera, so I'm unable to conduct the reasonable accommodation meeting."

87. There was no legitimate basis for Abdullah to conclude the meeting without discussing Ms. Jordan-Sweeney's request for accommodation.

### G. September 19, 2025: Ms. Jordan-Sweeney Complains of Disability Discrimination to Department Head Buckwalter

88. During this same time period, in response to the pressure to work in an unsafe environment, and the sense of unreasonable surveillance from her supervisors, Ms. Jordan-Sweeney began experiencing worsened difficulty breathing and dizziness.

89. These symptoms indicated that the stress at work may be exacerbating her heart condition.[5]

90. Based on the obstacles Ms. Jordan was experiencing in seeking to renew her accommodation, Ms. Jordan raised concerns of unlawful disability discrimination.

91. First, Ms. Jordan-Sweeney sought help from IT General Manager Nathan Buckwalter ("Buckwalter"),[6] telling him:

> "I am writing to you asking for your help. I have serious, life-threatening health conditions and documentation from three medical providers indicating that in person in office work poses a serious risk to my health, including the possibility of death. As I'm sure you are aware, **I have been required to re-apply for an accommodation which has been effective for the last almost 3 years**.

---

[5] Ms. Jordan-Sweeney underwent medical testing in October and November 2025, including a PET CT and a CVS PET stress lexiscan. In December 2025, she was diagnosed with pulmonary arterial hypertension.

[6] Ms. Jorda-Sweeney reported to John Hart (State Administrative Manager), who reported to Sanjay Srivastava (Division Director), who reported to Nathan Buckwalter (IT General Manager).

> **This process is making those conditions worse.** This can be shown with recent medical testing I was required to complete in order to get necessary updated paperwork.
>
> I understand there is a budget issue at this time, and part of that is centered around the disagreements on in-person work requirements. My request is an accommodation request and is outside of any requirement for general in person work, even if it were in the final budget which it is not. I have relented and submitted a new request but HR is refusing to process it and Heather [Frisk] is refusing to process a chain of command request [approving the accommodation request] unless HR denies my request first. **My rights under the ADA are being violated**. In addition, because I am being required to complete steps that others are not being required to complete, **I feel I am being discriminated against**. I have tried to work with my management, with Heather [Frisk], with HR but to no avail . . . **All I am asking for is the opportunity to perform my work duties, without discrimination, without harassment, and without putting my health and life at risk**."

(Emphasis added.)

92. In response, Buckwalter merely "encourage[d]" Ms. Jordan-Sweeney to complete "the reasonable accommodation process," indicated he had relayed her concerns to HR Director Catherine Lane, and directed Ms. Jordan-Sweeney to report any discrimination allegations to HR.

93. Ms. Jordan-Sweeney was already in communication with HR and specifically concerned that HR itself was facilitating the discrimination.

94. On information and belief, Buckwalter took no further steps to address

Ms. Jordan-Sweeney's discrimination complaint.

### H. September 22, 2025: HR Finally Meets with Ms. Jordan-Sweeney, But Questions Her Disability and Denies Her Request Because "it is an office job."

95. On September 22, 2025, Ms. Jordan-Sweeney attempted to virtually meet with Abdullah for a third time to discuss her accommodations request.

96. During this meeting, Ms. Jordan-Sweeney specifically stated that her request to work fully remotely was based on her need to avoid physical activity, which exacerbated her heart condition and caused her oxygen levels to drop, and, further, repeatedly referred to the medical documentation she had provided.

97. However, Abdullah was completely unreceptive during this meeting, incredulous of Ms. Jordan-Sweeney's request for accommodation, and was otherwise rude and accusatory.

98. By way of example, when Ms. Jordan-Sweeney repeatedly reiterated the basis for her need to work remotely, namely that physical exertion such as walking or climbing the stairs at the office would cause her oxygen levels to drop, Abdullah was incredulous, remarking, "So, when you're not in the office, you walk nowhere?"

99. When Ms. Jordan-Sweeney attempted to explain her situation and respond to Abdullah's questions, Abdullah responded with rudeness and accusations, such as the following:

a. "I'm going to be honest with you, you are not helping yourself whatsoever. You really aren't. You're very argumentative."

b. "[Y]ou're not very cooperative."

c. "Already, deadpan, not wanting to talk. So, I'm just saying, you're not helping yourself. Okay?"

d. "I am not going to sit up here and take abuse from you. You are not cooperative…"

e. "So, what I'm going to do is write down that you refused to participate."

f. "[Y]ou're argumentative…"

g. "Your behavior is not appropriate."

h. "You're refusing to participate in the interactive process."

i. "I'm not going to take abuse from you."

100. At no point during the conversation did Ms. Jordan-Sweeney behave inappropriately or abusively.

101. Ultimately, Abdullah ignored the information that Ms. Jordan-Sweeny provided, as well as her medical documentation, and the fact that Ms. Jordan-Sweeney had successfully performed her job remotely for a number of years, and baselessly concluded: "It is an office job, so if you're not able to come into the office, then what we have to recommend is that you contact DMO for a leave of absence."

102. Abdullah indicated that Ms. Jordan-Sweeney could potentially be accommodated if her condition was "temporary," "[o]therwise, you cannot have a

permanent work from home accommodation."

103. Abdullah concluded the meeting by telling Ms. Jordan-Sweeney that she was going to report her behavior to Ms. Jordan-Sweeney's supervisor.

104. Abdullah never in fact reported any concerns to Ms. Jordan-Sweeney's supervisor.

### I. September 29, 2025: HR Formally Denies Ms. Jordan-Sweeney's Second Renewed Accommodation Request to Work Remotely.

105. On September 29, 2025, Abdullah formally notified Ms. Jordan-Sweeney that her request for accommodation to continue to work remotely was denied. Abdullah asserted the following bases for the denial:

a. "[Y]ou did not articulate how your disability impacted the essential functions of your job. You indicated that your heart condition can be negatively impacted by any physical exertion. However, there is no reasonable or effective accommodation that would remove no physical exertion as a barrier."

b. "Furthermore, although many of your duties can be performed in the office or from home, your job is designated as an office job which would require at least some in-office work."

106. These conclusory justifications for denial did not articulate any reason why the accommodation would pose an undue hardship to the employer.

107. DTMB did not attempt to engage in any interactive process with Ms. Jordan-Sweeney before issuing the denial.

108. DTMB never asked Ms. Jordan-Sweeney to provide updated or clarified medical records to assist them in understanding the basis for her requested accommodation.

109. There was no legitimate basis to deny Ms. Jordan-Sweeney's accommodation request to continue to work remotely:

a. Abdullah did not identify any legitimate undue hardship that DTMB would suffer as a result of granting Ms. Jordan-Sweeney's accommodation request.

b. Abdullah did not articulate why the existing accommodation would suddenly pose a new undue hardship to the employer, given that the accommodation had already been in place for over two years without incident.

c. The stated reasons for denial also did not articulate why the accommodation posed an undue hardship to the employer in light of the fact that Ms. Jordan-Sweeney's entire team worked remotely four days a week.

d. Neither Abdullah, nor anyone else, asked Ms. Jordan-Sweeney's supervisor, John Hart, whether her history of working remotely had caused any undue hardship.

e. Ms. Jordan-Sweeney's supervisor, John Hart, supported her request to continue to work remotely. In July of 2025, Hart vocalized support for Ms. Jordan-Sweeney to continue to work remotely, telling her that "100 percent truthfully, I hope that's the case" that her accommodation continued. Further telling her, "you've been able to function[,] from my perspective, fully remote with no issues. So I want you to be able to continue do that [work remotely]. It's just this [accommodations request process] is being forced on us both."

f. Despite what Abdullah's denial articulated, nowhere in Ms. Jordan-Sweeney's job description does it state that her position requires "in-office work."

g. Rather, Ms. Jordan-Sweeney's job description states, "No physical or environmental restrictions."

h. DTMB Agency Services Policies & Procedures (rev. 6/4/26) provide for reasonable accommodations for remote work: "The current DTMB policy allows for remote work up to three business days per week. Exceptions to the standard exist for approved reasonable accommodations, approval through DTMB leadership, or intermittent FMLA approved through the Disability Management Office."

i. Furthermore, as of September 29, 2025, Ms. Jordan-Sweeney had been performing her job well for over five years while working remotely on a full-time basis, and her job responsibilities had not altered.

110. Ms. Jordan-Sweeney responded to Abdullah's denial, on October 2, 2025, challenging the basis for the denial.

111. Abdullah declined to do anything further and referred Ms. Jordan-Sweeney to the union grievance procedure.

### J. September 22, 2025: Ms. Jordan-Sweeney Complains of Disability Discrimination to HR Director Lane

112. On September 22, 2025, following Ms. Jordan-Sweeney's meeting with Abdullah, Ms. Jordan-Sweeney promptly emailed Abdullah's supervisor, HR Director Catherine Lane, regarding Abdullah's behavior and explained that "[t]he amount of additional stress this has and is causing has put additional strain on my

heart, which can be demonstrated by the medical tests I have recently been required to complete due to the requirement that I reach out to Heather [Frisk] and subsequently restart this process."

113. Ms. Jordan-Sweeney concluded her communication to Lane with: "I am hopeful that you will look into this situation and take whatever steps are necessary to rectify it."

114. Despite Ms. Jordan-Sweeney's request, Lane, nor anyone else, took any follow up action to engage Ms. Jordan-Sweeney in the interactive process with regard to her request for accommodation or otherwise take any investigative measures with regard to her complaint.

### K. Ms. Jordan-Sweeney Advocates for Another Employee Seeking to Exercise her Right to Reasonable Accommodations

115. Meanwhile, during this same time period in September and October of 2025, Ms. Jordan-Sweeney also advocated for her direct report, Evelyn Sisson, who was similarly attempting to exercise her right to seek a reasonable accommodation for remote work due to her own health condition.

116. Ms. Sisson had attempted to receive her own chain of command approval for a reasonable accommodation in order to work remotely full time, which was also denied.

117. Ms. Jordan-Sweeny stated repeatedly to Frick, Buckwalter, Hart, and

Lane that Ms. Sisson deserved to receive a reason for the denial.

118. Ms. Jordan-Sweeney also asked leadership if there was ever an intent to consider Ms. Sisson's request, and why her medical information was required if not.

119. DTMB leadership did not provide meaningful responses to these questions.

120. When Ms. Sisson did not report to work in person and continued to work remotely, Hart directed Ms. Jordan-Sweeney to issue a Notice of Formal Counseling to her.

121. Ms. Jordan-Sweeney expressed her disagreement with this disciplinary measure but complied with the directive from Hart.

122. Ms. Jordan-Sweeney issued the Notice of Formal Counseling to Sisson with modifications to the document to state her disagreement with the discipline.

123. On the Notice, signed October 2, 2025, Ms. Jordan-Sweeney wrote under Supervisor's Notes:

"Signature provided under duress given the following:

- This form was not requested, written, filled out, or sent by Evelyn [Sisson]'s direct supervisor. It was sent by Cathy Lane to John Hard who sent it to Rebecca Jordan-Sweeney with 'formal direction' to sign and have Evelyn sign.
- Employee has used SKLV [sick leave] only twice since denial of accommodation request. This is not a pattern.

- Employee has used SKLV to accommodate medical appointments. Per feedback from Nathan Buckwalter regarding other resources with similar circumstance, this does not indicate a pattern.

- I have requested confirmation that the requirement to make up in office days is applied across the team in an equitable manner and was unable to receive such confirmation. **Applying this approach to a single individual who has requested both HR and chain of command accommodation for a supported disability appears to be harassing, discriminatory, and leading to a hostile work environment.**

- I have requested confirmation that the requirement to make up in office days is an approved and documented policy and was unable to receive such confirmation.

- **Employee has submitted both HR and chain of command accommodation requests which have been denied, seemingly for inappropriate or inaccurate reasons, and seemingly in violation of her rights according to State of Michigan Administrative Guide to State Government 1650.01 Reasonable Accommodations, Michigan Civil Service Commission Regulation 1.04, Civil Service Rule 1-8.2 Accommodation of Disabilities, and United States American [sic] with Disabilities Act Title I.**

(Emphasis added.)

124. Similarly, Sisson wrote in the Employee notes that she had a pending request for accommodation based on her medical restrictions, and stated: "Since there is no handicapped parking near or around the building currently, I am unable to walk to the building."

125. Lane and Hart insisted that Ms. Jordan-Sweeney issue the discipline,

nonetheless.

### L. October 1, 2025: Ms. Jordan-Sweeney Receives Approval for Intermittent FMLA Leave

126. On October 1, 2025, the DMO emailed Ms. Jordan-Sweeney that she was "approved for a [sic] Intermittent leave of absence," with retroactive effect starting September 15, 2025 and continuing through March 15, 2026.

127. The October 1st approval email stated that the DMO would provide a copy of the approval to Ms. Jordan-Sweeney's supervisor and Human Resources Office. The approval letter also stated that the DMO was responsible to notify her supervisor and the HR office of "the status of extensions, FMLA, Civil Service, and Union entitlements," "requested restrictions," and "when the employee is scheduled or released to return to work."

128. Hart, her direct supervisor, was copied on this email.

129. The October 1st approval email did not place restrictions on the number of days or frequency of her intermittent leave.

### M. October 3, 2025: Ms. Jordan-Sweeney Receives Formal Discipline for Missing Work While She Was Entitled to FMLA Leave, and She Complains of Discrimination a Third Time

130. On October 3, 2025, during a virtual meeting, Hart issued Ms. Jordan-Sweeney a "Notice of Formal Counseling" for Ms. Jordan-Sweeney's failure to appear in the office throughout the period in which she was seeking to continue her

accommodation to work remotely.

131. Ms. Jordan-Sweeney had just received FMLA approval for intermittent FMLA leave on October 1, 2025, effective from September 15, 2025 through March 15, 2026.

132. Hart was copied on the October 1, 2025 FMLA approval email.

133. Despite his knowledge that Ms. Jordan-Sweeney had approved FMLA leave time, he disciplined her for missing work while she was entitled to FMLA leave.

134. Hart did not apply FMLA leave time to any of the allegedly unexcused absences.

135. During the meeting, Ms. Jordan-Sweeney explicitly objected to the disciplinary action and alleged that it was being done in retaliation for seeking reasonable accommodation for her disability.

136. Hart suggested Ms. Jordan-Sweeney could submit another "official" chain of command request for accommodations through Heather Frick.

137. At the conclusion of the meeting, Ms. Jordan-Sweeney repeated that the disciplinary action was retaliatory for seeking accommodations:

> **Ms. Jordan-Sweeney**: "And I mean honestly all of this could be avoided if they would just be aligned with what's required by law and let me just continue doing my job which you and I have agreed multiple times there's been no issue with me doing my job. I just want [to be] left alone

> to do my job like everybody else is left alone to do their job **instead of singled out because I need an accommodation**."
>
> **Hart**: "Yeah understood."

138. Despite Ms. Jordan-Sweeney's complaints of retaliation, Hart took no follow up action, such as escalating the allegations to Human Resources, obtaining a statement from Ms. Jordan-Sweeney, or any other investigative actions.

### N. October 3, 2025: Ms. Jordan-Sweeney Submits a Third Renewed Request for Accommodation

139. On October 3, 2025, as directed by Hart, Ms. Jordan-Sweeney emailed Frick that Abdullah had denied her accommodation request and asked to "renew" her chain of command request for accommodations through Frick.

140. Thirty-five minutes later, Frick denied Ms. Jordan-Sweeney's request for accommodation by email without providing any reason.

141. The same day, Friday, October 3, 2025, Ms. Jordan-Sweeney suffered extreme emotional distress, hyperventilation, crying, and anxiety in response to the intense stress at work.

142. She notified her supervisor, Hart, that she was going into the hospital, informing him it was "a flare up of my disability due to the harassment I am facing at work."

143. At urgent care, the provider prescribed medication and directed Ms.

Jordan-Sweeney not to attend work on the following Monday.

**October 6–9, 2025: Ms. Jordan-Sweeney Misses Work for Medical Care and Recovery Necessitated by Workplace Stress**

144. On Monday, October 6, 2025, Ms. Jordan-Sweeney missed work in accordance with the clinic provider's direction.

145. She provided notice to her supervisors and relevant leadership that she would be out of the office that morning with a calendar invite, which had always been an acceptable way to give such notice in the past.

146. Ms. Jordan-Sweeney had just received FMLA approval for intermittent FMLA leave on October 1, 2025.

147. Ms. Jordan-Sweeney had notified Hart in advance that she was taking time off because of symptoms related to her heart condition.

148. Nonetheless, her October 6, 2025 absence was not designated as FMLA leave.

149. On Tuesday, October 7, 2025, and Wednesday, October 8, 2025, at the direction of her therapist, Stanley W. Russell, Ms. Jordan-Sweeney took sick leave due to the workplace stress and the impact on her health.

150. For each of these days, Ms. Jordan-Sweeney provided notice to her supervisors and relevant DTMB leadership that she was out of office with a calendar invite, which had always been an acceptable way to give such notice in the past.

151. On Thursday, October 9, 2025, Ms. Jordan-Sweeney attempted to take another day of leave using her FMLA leave, which had been approved the previous week.

152. On October 9, 2025, Ms. Jordan-Sweeney again provided a calendar notification that she would be out of the office to DTMB leadership. She also emailed her supervisor John Hart: “I will be OOO today Thursday October 9 as indicated below. I have a medical appointment and will be utilizing approved FMLA time. I will update submitted timesheets accordingly.”

153. The same morning, on October 9, 2025, Ms. Jordan-Sweeney received a letter notifying her that she had missed work without approval from October 6th to the 8th. The letter stated that she would be terminated if she did not return to work by 8:00am on October 10, 2025.

154. Upon receiving the letter, Ms. Jordan-Sweeney immediately contacted her doctor. Dr. Judith Cronin provided a letter a few hours later approving her to return to work on remote basis.

155. That afternoon, Ms. Jordan-Sweeney provided the return-to-work letter to Hart and resumed working on a remote basis.

156. The same day, October 9, 2025, Ms. Jordan-Sweeney called DTMB Disability Management Office for help. The agent told her: “they don't make it that easy to be approved for DTMB” for restrictions to work from home, and “that’s just

something that DTMB is enforcing. They want their employees to be in office for the office days." The agent told Ms. Jordan-Sweeney that they received this information from HR Director Catherine Lane.

157. On October 9, 2025, Ms. Jordan-Sweeney submitted her timesheet for the days she had missed work, designating some as sick days and some as FMLA days for medical appointments. Her supervisor, John Hart, approved the timesheets.

**October 9, 2025: Ms. Jordan is Suspended for Persisting in Seeking Accommodation, Using FMLA Time, and Opposing Disability Discrimination**

158. On October 9, 2025, Lane notified Ms. Jordan-Sweeney that she was suspended without pay for seven days pending an investigation into Ms. Jordan-Sweeney's conduct.

159. Lane issued a formal letter the same day, which asserted that Ms. Jordan-Sweeney had violated the following DTMB work rules:

> 4. Failure to carry out instructions, work assignments or otherwise being derelict in the performance of one's duties.
>
> 5. Failure to request leave time in advance. Call-in absences must be reported to the employee's supervisor within 30 minutes of the employee's start time. Documentation for absences must be provided upon request.
>
> 7. Insubordination.
>
> 12. Failure to work in a professional and cooperative manner with management/supervisors, subordinates, coworkers,

customers, partners and/or vendors.

15. Behave in an inappropriate manner or a manner that may harm or adversely affect the reputation of DTMB or the state of Michigan.

30. Failure to comply with rules/policies/regulations.

31. Conduct unbecoming a state employee.

160. Lane did not explain to Ms. Jordan-Sweeney how she had allegedly violated any of these rules.

161. The letter did not specify any dates or details for the alleged "Failure to request leave time in advance."

162. DTMB subsequently converted this to an indefinite suspension pending investigation.

163. Ms. Jordan-Sweeney was never permitted to return from the suspension.

**October 10, 2025: HR Limits Jordan-Sweeney's Intermittent FMLA Leave to Three Days a Month, and She Asks for Help to Exercise Her FMLA Rights "while I fight them trying to fire me for my disability"**

164. On October 10, 20265—after Ms. Jordan-Sweeney attempted to use FMLA leave over a period of four days—the DMO emailed Ms. Jordan-Sweeney a letter limiting her to three days per month.

165. The letter stated that leave was approved for 1-3 appointments per month, one day per appointment.

166. Three days per month would not be enough time to cover days that she missed work due to a lack of accommodation, while she attempted to work out the accommodations arrangement with HR.

167. Ms. Jordan-Sweeney responded by email the same day, copying Morrison, Hart, and multiple personnel from the Michigan Civil Service Commission. In her email, she asked again to use FMLA while she attempted to resolve the request for a reasonable accommodation. She specifically reported a hostile work environment and a concern that DTMB was "trying to fire me for my disability":

> My primary care doctor won't provide me with a note saying I need to be off work for 2 months straight. **Is there another way I can use my fmla while going through this process?** Ideally I would like to use 8 weeks but I understand if that can't be possible. **I am trying to cover myself while I fight them trying to fire me for my disability.** I've already been taking next steps. I know they plan to try again to fire me either during this 7 days or right agreed [sic]. **Would it be sufficient if my therapist were to provide a note indicating the PTSD and anxiety are triggered and made worse by working in a hostile environment while fighting to keep my job?** Anxiety obviously makes a heart condition worse and puts the patient at greater risk.

(Emphasis added.)

168. No one responded to this email to assist her.

169. Ms. Jordan-Sweeney called the DMO, at which point a DMO representative instructed her that she should apply for continuous FMLA leave.

170. The evening of October 10, 2025, the DMO emailed Ms. Jordan-

Sweeney a new, blank set of FMLA forms to apply for continuous FMLA leave.

171. Ms. Jordan-Sweeney strongly preferred to continue working as much as she was permitted to work while she attempted to resolve the accommodations arrangement.

172. On October 21, Ms. Jordan-Sweeney emailed further FMLA documentation to the DMO, writing:

> Please find attached the medical certification from my provider provided previously for the existing approved FMLA as well as a statement from HR indicating that due to my condition and no accommodation being available, the recommendation is that I work with DMO for a leave of absence.
>
> After having been off work for three days, I received a release to return to work with the restriction of remote work only. I was also advised verbally by Dashonna Abdullah that "If (I) I am unable to be in the office then (I) am unable to do my job and (I) need to be on disability leave of absence. I am requesting the same timeframe as the initial request with the understanding that FMLA entitlement will be exhausting prior to the end date indicated.

173. Ms. Jordan-Sweeney attached Abdullah's September 29th letter denying the accommodation to work remotely and an attestation from her primary care provider.

174. On October 22, 2025, Ms. Jordan-Sweeney submitted an updated FMLA application, either for continuous leave or for intermittent leave for one day per week to attend medical appointments, and for one to four days per week for

health episodes or "flare-ups."[7]

175. Ms. Jordan-Sweeney repeatedly provided updated FMLA paperwork to the DMO while the accommodation issue was pending.

**October 27, 2025: HR Director Lane Issues Report Clearing Herself of Disability Discrimination and Finding That Ms. Jordan-Sweeney Has Violated Multiple DTMB Rules**

176. On October 27, 2025, HR Director Catherine Lane issued an investigation report, which concluded that Ms. Jordan-Sweeney had violated the following DTMB work rules:

> 4. Failure to carry out instructions, work assignments or otherwise being derelict in the performance of one's duties.
>
> 5. Failure to request leave time in advance. Call-in absences must be reported to the employee's supervisor within 30 minutes of the employee's start time. Documentation for absences must be provided upon request.
>
> 7. Insubordination.
>
> 12. Failure to work in a professional and cooperative manner with management/supervisors, subordinates, coworkers, customers, partners and/or vendors.
>
> 15. Behave in an inappropriate manner or a manner that may harm or adversely affect the reputation of DTMB or the state of Michigan.

---

[7] Ms. Jordan-Sweeney already had approval for intermittent FMLA leave up to three days per month. She received that approval on October 1, 2025, with effect from September 15, 2025 through March 15, 2026. This renewed application sought to increase the number of days should could take intermittent leave.

30. Failure to comply with rules/policies/regulations.

31. Conduct unbecoming a state employee.

177. In support of these alleged violations, Lane alleged that Ms. Jordan-Sweeney had “refused to participate in the interactive process” for a reasonable accommodation.

178. Lane’s investigation report asserted that when Ms. Jordan-Sweeney modified the disciplinary notice for Ms. Sisson to express her disagreement with the discipline, that constituted “insubordination.”

179. Lane’s investigation report asserted that Ms. Jordan-Sweeney was “not willing to follow direct orders,” and that Ms. Jordan-Sweeney had “falsified” her prior accommodations approval from 2023-2025.

180. Lane’s investigation report found that Ms. Jordan-Sweeney had failed to “request leave time in advance” by taking time off for her medical condition on October 6, October 7, and October 8, even though she was approved for intermittent FMLA leave during that time period.

181. Ms. Jordan-Sweeney had notified John Hart of those absences in the say way she had always communicated absences during her employment, by using a calendar invite. Hart had never objected to this method.

182. Lane’s investigation report recommended discipline, demotion, or

dismissal.

**November 2025: Blocked from Receiving Accommodations or FMLA, Ms. Jordan-Sweeney is Terminated**

183. On October 28, 2025, the DMO informed her that they were unable to approve a continuous leave of absence: "Your medical certification did not supply enough information to support a continuous leave of absence."

184. The DMO ordered her to submit further certification by November 4, 2025.

185. On November 4, 2025, Ms. Jordan-Sweeney called the DMO and informed them that her doctor was still working on the medical certification, and it would be provided as quickly as possible.

186. On November 5, 2025, Ms. Jordan-Sweeney received a denial of her request for continuous medical leave. The reason provided was: "Sufficient documentation not provided."

187. The same day, Ms. Jordan-Sweeney emailed the DMO in response: "Attached please find the letter from my provider including the dates of restriction. Please note that I called the DMO yesterday and explained I was waiting for this documentation from my provider. If you could please complete processing of this update in the application as soon as possible, it would be greatly appreciated."

188. On November 6, 2025, Ms. Jordan-Sweeney was ordered to attend a

meeting with her supervisor John Hart and the HR Director Catherine Lane.

189. During the meeting, Lane informed Ms. Jordan-Sweeney that she was being terminated.

190. During the meeting, Lane stated: "if you're not qualified to be in the office, you're not qualified to do this job."

191. Lane also stated during the termination meeting that she initially investigated Ms. Jordan-Sweeney in October because of the changes Ms. Jordan-Sweeney made on the Notice of Formal Counseling issued to Evelyn Sisson in order to express her opposition to the discipline.

192. Until the Notice of Formal Counseling and investigation in October 2025, Ms. Jordan-Sweeney had no prior disciplinary history in nearly 10 years with the State of Michigan.

193. During the termination call, Hart stated that if Ms. Jordan-Sweeney had returned to the office after her requests for accommodation were communicated, "I don't think we would be here today."

**COUNT I**
**REHABILITATION ACT**
***Disability Discrimination and Failure to Accommodate***

194. Plaintiff incorporates the foregoing allegations by reference as though stated in full herein.

195. At all times relevant hereto, Plaintiff was an employee and Defendant

was an employer under the Rehabilitation Act of 1973 29 U.S.C. §§ 701 et seq.

***Disability Discrimination***

196. The Rehabilitation Act of 1973 makes it unlawful for an employer to discriminate against a qualified individual because the individual has a disability, a record of a disability, or because the employer regards the individual as disabled.

197. At all times relevant to this action, Plaintiff was a qualified individual with a disability pursuant to 29 U.S.C. §§ 701 et seq., who, with or without accommodation, could perform the essential functions of her position.

198. Plaintiff was an individual with a disability within the meaning of 29 U.S.C. §§ 701 et seq., in that she had a physical impairment that substantially limits one or more of her major life activities, who with or without accommodation could perform the essential functions of her job with Defendant, and/or Plaintiff had a record of such a disability, and/or was regarded by Defendant as having such a disability.

199. Notwithstanding said duties as set forth above, Defendant discriminated against Plaintiff because of her disability.

200. Defendant discriminated against Plaintiff because of her disability in violation of the Rehabilitation Act in several ways, including and not limited to:

a) Arbitrarily delaying and obstructing Plaintiff's attempts to apply for a reasonable accommodation;

b) Refusing to provide a reasonable accommodation;

c) Adopting a policy of denying accommodations for employees whose disabilities could be reasonably accommodated by working from home without any undue hardship to the employer;

d) Suspending, investigating, and then terminating Plaintiff after she attempted to exercise her right to seek an accommodation.

201. As a direct and approximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer lost wages, and other economic advantages of employment; Plaintiff has and will continue to suffer physical injury, mental anguish, humiliation, embarrassment, and emotional distress, and pain and suffering resulting from the discriminatory and retaliatory conduct of the Defendant.

***Failure to Accommodate***

202. The Rehabilitation Act further requires employers to engage in a meaningful interactive process with employees with regard to reasonable accommodations.

203. Despite this obligation, Defendant failed to engage in a meaningful interactive process with Plaintiff to determine a reasonable accommodation.

204. At all times relevant hereto, Defendant had a duty under the Rehabilitation Act to accommodate Plaintiff for purposes of employment unless the accommodation would impose an undue hardship. Defendant's duty to

accommodate Plaintiff includes, but is not limited to, providing Plaintiff with intermittent medical leave.

205. At all times relevant hereto, Defendant could have accommodated Plaintiff's disability without suffering an undue hardship.

206. Despite this obligation, Defendant failed to provide Plaintiff with a reasonable accommodation, in violation of the Rehabilitation Act, including and not limited to:

a) Arbitrarily delaying and obstructing Plaintiff's attempts to apply for a reasonable accommodation;
b) Refusing to provide a reasonable accommodation;
c) Adopting a policy of denying accommodations for employees whose disabilities could be reasonably accommodated by working from home without any undue hardship to the employer;
d) Suspending, investigating, and then terminating Plaintiff after she attempted to exercise her right to seek an accommodation.

207. As a direct and approximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer lost wages, and other economic advantages of employment; Plaintiff has and will continue to suffer physical injury, mental anguish, humiliation, embarrassment, and emotional distress, and pain and suffering resulting from the discriminatory and retaliatory conduct of the Defendant.

**COUNT II**
**MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT**
***Disability Discrimination, Failure to Accommodate, and Retaliation***

208. Plaintiff incorporates the foregoing allegations by reference as though stated in full herein.

209. At all times relevant hereto, Plaintiff was an employee and Defendant was an employer under the PDCRA, MCL 37.1201 et seq.

210. The PDCRA makes it unlawful for an employer to discriminate against a qualified individual because the individual has a disability, a record of a disability, or because the employer regards the individual as disabled.

211. At all times relevant to this action, Plaintiff was a qualified individual with a disability within the meaning of the PDCRA in that she had a physical impairment that substantially limits one or more of her major life activities, who with or without accommodation could perform the essential functions of her job with Defendant, and/or Plaintiff had a record of such a disability, and/or was regarded by Defendant as having such a disability.

212. Notwithstanding said duties as set forth above, Defendant discriminated against Plaintiff because of her disability and/or because it regarded Plaintiff as disabled and/or because Plaintiff had a history of a disability when it terminated Plaintiff's employment.

### *Failure to Accommodate*

213. The PDCRA further requires employers to engage in a meaningful interactive process with employees in response to requests for reasonable accommodations.

214. Plaintiff submitted multiple written requests for reasonable accommodations for her disability, namely, to work remotely and for medical leave.

215. At all times relevant hereto, Defendant had a duty under the PDCRA to accommodate Plaintiff for purposes of employment unless the accommodation would impose an undue hardship. Defendant's duty to accommodate Plaintiff includes, but is not limited to, allowing Plaintiff to continue work remotely and providing Plaintiff with medical leave.

216. At all times relevant hereto, Defendant could have accommodated Plaintiff's disability without suffering an undue hardship.

### *Retaliation*

217. At all times relevant hereto, Defendant had a duty not to retaliate against Plaintiff with respect to her employment, compensation or terms, conditions or privileges of employment, or to limit, segregate, or classify Plaintiff for employment in any way which deprived or tended to deprive Plaintiff of employment opportunities or otherwise adversely affect the employment status of Plaintiff, in retaliation for her requesting and/or requiring accommodation or for

objecting to disability discrimination.

218. Notwithstanding said duties as set forth above, Defendant retaliated against Plaintiff for requesting and/or requiring accommodation and/or for objecting to disability discrimination when it terminated her employment.

219. As a direct and approximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer lost wages, and other economic advantages of employment; Plaintiff has and will continue to suffer physical injury, mental anguish, humiliation, embarrassment, and emotional distress, and pain and suffering resulting from the discriminatory and retaliatory conduct of the Defendant.

**COUNT III**
**FAMILY AND MEDICAL LEAVE ACT**
***Unlawful Interference***

220. Plaintiff incorporates the foregoing allegations by reference as though stated in full herein.

221. At all relevant times, Plaintiff was an employee, and Defendant was an employer within the definition pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. 2611(4); 29 C.F.R. 825.104–.105; 29 C.F.R. § 825.110(a).

222. Plaintiff was eligible for FMLA leave because her Heart Failure with Preserved Ejection Fraction constituted a serious health condition as defined by the Act. See 29 U.S.C. § 2612(a)(1)(D).

223. Defendant had a duty under the FMLA to inform Plaintiff accurately of

her statutory rights and to provide her with up to 12 weeks of continuous or intermittent leave for her serious health condition.

224. Plaintiff gave Defendant notice of her intention to take leave by repeatedly submitting FMLA paperwork, attempting to supplement that paperwork, and by repeatedly asking HR and DMO personnel how to exercise her FMLA rights.

225. Defendant interfered with Plaintiff's FMLA rights, including and not limited to:

a) Failing to provide accurate information to Plaintiff regarding the differences between continuous and intermittent leave, causing her to apply for FMLA three times in an attempt to secure approval;

b) Investigating and then terminating Plaintiff for absences in September and October 2025 that were eligible for FMLA coverage under her approved intermittent FMLA leave.

c) Failing to provide accurate information to Plaintiff regarding her FMLA rights, including her right to take FMLA leave as an accommodation for her disability, which effectively prevented her from doing so;

d) Effectively delaying Plaintiff's ability to exercise her right to continuous FMLA leave until she was terminated.

226. As a direct and approximate result of Defendant's conduct, Plaintiff has

suffered and will continue to suffer lost wages, and other economic advantages of employment; Plaintiff has and will continue to suffer physical injury, mental anguish, humiliation, embarrassment, and emotional distress, and pain and suffering resulting from the conduct of the Defendant.

**COUNT IV**
**FAMILY AND MEDICAL LEAVE ACT**
***Retaliation***
*Plaintiff v. State of Michigan, DTMB*

227. Plaintiff incorporates the foregoing allegations by reference as though stated in full herein.

228. At all relevant times, Plaintiff was an employee and Defendant was an employer within the definition pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. 2611(4); 29 C.F.R. 825.104–.105; 29 C.F.R. § 825.110(a).

229. Plaintiff was eligible for FMLA leave because her Heart Failure with Preserved Ejection Fraction constituted a serious health condition as defined by the Act. See 29 U.S.C. § 2612(a)(1)(D).

230. Defendant had a duty under the FMLA to inform Plaintiff accurately of her statutory rights and to provide her with up to 12 weeks of continuous or intermittent leave for her serious health condition.

231. Plaintiff gave Defendant notice of her intention to take leave by repeatedly submitting FMLA paperwork, attempting to supplement that paperwork,

and by repeatedly asking HR and DMO personnel how to exercise her FMLA rights.

232. Defendant had a duty under the FMLA not to retaliate against Plaintiff because she sought to exercise her FMLA rights.

233. The Sixth Circuit Court of Appeals has recognized that an employee who is discharged in retaliation for intending to take a statutorily protected leave has stated a viable cause of action against his or her former employer under the FMLA. *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309, 314 (2001).

234. An employer is prohibited from discharging an employee because the employee has given, or is about to give, any information relating to a right under the Act. 29 C.F.R. § 825.220.

235. Defendant retaliated against Plaintiff for exercising her rights under the FMLA, and did so willfully, including but not limited to:

a) Suspending, investigating, and then terminating Plaintiff for absences in September and October 2025 that were eligible for FMLA coverage under her approved intermittent FMLA leave.

b) Barring Plaintiff from returning to her job after using approved intermittent FMLA days away from work in September and October 2025.

c) Terminating Plaintiff after she expressed her intention to either use intermittent FMLA leave or take a leave of absence under the

FMLA pending a solution for a reasonable accommodation.

d) Terminating Plaintiff after she provided information necessary to secure a right guaranteed under the FMLA.

e) Terminating Plaintiff after she attempted to exercise her rights under the FMLA as an accommodation for her disability, as she was entitled to do. *See King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 561 (6th Cir. 2022).

236. As a direct and approximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer lost wages, and other economic advantages of employment; Plaintiff has and will continue to suffer physical injury, mental anguish, humiliation, embarrassment, and emotional distress, and pain and suffering resulting from the discriminatory and retaliatory conduct of the Defendant.

**REQUEST FOR RELIEF**

Accordingly, Plaintiff requests the following relief:

A. An order reinstating Plaintiff to her former position or a comparable position;

B. An order awarding Plaintiff compensation in an amount she is found to be entitled to;

C. An order awarding Plaintiff liquidated damages as provided under the FMLA;

D. An order awarding Plaintiff interest, costs, attorney fees and litigation expenses as provided by law;

E. An order granting Plaintiff all such other relief as the Court deems just and equitable.

Respectfully submitted,

Pitt McGehee Palmer Bonanni & Rivers PC

By: s/ Channing Robinson-Holmes

Channing Robinson-Holmes (P81698)
Attorney for Plaintiff
117 W. 4th Street, Ste. 200
Royal Oak, MI 48067
(248) 398-9800
crobinson@pittlawpc.com

Dated: September 22, 2026

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| REBECCA JORDAN-SWEENEY,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF MICHIGAN, MICHIGAN DEPARTMENT OF TECHNOLOGY, MANAGEMENT & BUDGET (DTMB),<br><br>Defendant. | Case No.<br><br>Hon.<br>United States District Judge |

**JURY DEMAND**

Plaintiff Rebecca Jordan-Sweeney hereby respectfully requests that this matter be tried before a jury.

Respectfully submitted,

Pitt McGehee Palmer Bonanni & Rivers PC

By: s/ Channing Robinson-Holmes
Channing Robinson-Holmes (P81698)
Attorney for Plaintiff
117 W. 4th Street, Ste. 200
Royal Oak, MI 48067
(248) 398-9800
crobinson@pittlawpc.com

Dated: September 22, 2026